UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEVIN PEGRAM,<br><br>  Plaintiff,<br><br> v.<br><br> MEGAN BRENNAN, et al.,<br><br>  Defendants. | Case No. 19-cv-02528-JSC<br><br>**ORDER RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 46, 58 |

Plaintiff brings disability discrimination and retaliation claims against his former employer, the U.S. Postal Service ("USPS").[1] (Dkt. No. 19.)[2] Before the Court is Defendants' motion for summary judgment on all claims. (Dkt. No. 46.) After carefully considering the parties' briefing, and having had the benefit of oral argument on December 16, 2021, the Court GRANTS the motion.

**FACTUAL BACKGROUND**

Plaintiff started working for USPS in December 1996. (Dkt. No. 47-1 at 7:20–8:11.) He became a full-time "regular employee" in August 1998. (*Id.* at 8:6-19, 11:18-21.) Until 2012 or 2013, Plaintiff's position was a level four mail handler at the Oakland Processing and Distribution Center. (*Id.* at 14:15-19, 30:9-14.) Plaintiff would go to work, clock in, speak with his supervisor, do his assignment with breaks and lunch, and continue his assignment until he clocked out at the end of his shift. (*Id.* at 29:19–30:1.)

---

[1] All parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c). (Dkt. No. 16.)

[2] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

1    Around 2012 or 2013, Plaintiff became a level five mail handler equipment operator
2  ("MHEO") on the day shift, from 7:00 a.m. to 3:30 p.m. (*Id.* at 14:22–15:9, 17:12-15; Dkt. No.
3  47-1 at 33:6-12.) His duties included operating a jitney and forklift, moving empty equipment,
4  performing routine safety inspections of equipment, and observing safety requirements. (Dkt. No.
5  47-2 at 2; Dkt. No. 47-1 at 35:5–36:1.)

6    Plaintiff alleges that he suffers from dyslexia and dysthymia, which were diagnosed in
7  1982 and are permanent. (Dkt. No. 19 ¶ 11; Dkt. No. 47-1 at 53:14-19.) He described his
8  dyslexia as having a hard time reading, interpreting, and generally "learning certain things and
9  understanding certain stuff." (Dkt. No. 47-1 at 54:15-16, 55:5-6.) He described his dysthymia as
10 having trouble explaining himself and putting his thoughts into words. (*Id.* at 59:1-22.) Plaintiff
11 was "hired as [an] employee with a disability" under a "special program" for people with
12 disabilities. (Dkt. No. 55-2 at 24:14-15, 67:14-21, 68:13-16.) Plaintiff testified that he is able to
13 perform the job duties of a level five MHEO. (Dkt. No. 47-1 at 64:19–65:21.)

14   Under the USPS attendance policy, an "unscheduled absence" is an absence that was not
15 requested and approved in advance. (Dkt. No. 48 ¶ 10.) Plaintiff understood that meaning. (Dkt.
16 No. 47-1 at 76:22-24.) To request "postal leave" for sick time or leave without pay on the same
17 day that he was scheduled to work, Plaintiff would call a USPS 800 number and select a number
18 to request leave using his employee ID. (*Id.* at 39:1–40:23.) For vacation or "annual leave,"
19 Plaintiff would review the available days in the vacation book at the Oakland facility, and then fill
20 out a form to request vacation from his supervisor. (*Id.* at 41:1–42:15.) If Plaintiff was going to
21 be late, he would call the 800 number and sometimes also try to call the Oakland facility to speak
22 with a supervisor directly. (*Id.* at 42:16–44:23.) Under the attendance policy, calling in sick or
23 late to the 800 number on the day an employee is scheduled to work is an unscheduled absence,
24 because it was not requested and approved in advance. (Dkt. No. 48 ¶ 10.) Between 2012 and
25 2018, Plaintiff had more than 500 unscheduled absences, including late arrivals. (*Id.* ¶ 17; Dkt.
26 No. 48-11.)

27   At his deposition, Plaintiff explained that he believes his absences to be related to his
28 disabilities. (Dkt. No. 47-1 at 68:12-15, 69:15-22, 74:15–75:1, 78:5-12, 80:2-7; *but see id.* at

2

66:24–67:18.) "I'll be having [] anxiety and . . . I lose focus in whatever it is I was doing at the moment, and then I just have a hard time coping with it and [] how I can focus on getting myself to show up for work." (*Id.* at 72:1-12.) "I have been out off work . . . because I have a hard time understanding the attendance procedure. . . . I had anxiety, and it [] had triggered my depression. . . . And just pushed me to a point where . . . I just didn't feel like I can perform my duties on that particular day." (*Id.* at 78:5-12, 80:2-7.)

In July 2010, Plaintiff received a Notice of Seven Day Suspension due to "Unsatisfactory Attendance – Absence Without Permission (AWOL)" for an unscheduled absence lasting from May 22 to June 7, 2010. (Dkt. No. 48 ¶ 4; Dkt. No. 48-1.) In March 2012, Plaintiff received a Letter of Warning for "Irregular and Unsatisfactory Attendance – Failure to Report for Duty as Scheduled and Required" for 32 unscheduled absences between November 2011 and February 2012. (Dkt. No. 48 ¶ 5; Dkt. No. 48-2.) In January 2013, Plaintiff received a Notice of Fourteen Day Suspension for "Unscheduled Absences/Irregular Attendance/AWOL" for more than 30 unscheduled absences between May and August 2012. (Dkt. No. 48 ¶ 6; Dkt. No. 48-3.)

Plaintiff first requested a reasonable accommodation for his disabilities sometime in 2013. (Dkt. No. 55-2 at 13:1-2.) In March 2013, Plaintiff received a Notice of Removal for "Continued Irregular and Unsatisfactory Attendance – Failure to Report for Duty as Scheduled and Required" for approximately 19 unscheduled absences between January and February 2013. (Dkt. No. 48 ¶ 7; Dkt. No. 48-4.) Under the Notice, Plaintiff was removed as of April 15, 2013. (Dkt. No. 48-4 at 2.) On April 2, 2013, Plaintiff requested a reasonable accommodation for his disabilities in writing to his supervisor, Maria Lozano. (Dkt. No. 55-2 at 16:9-16; Dkt. No. 47-10.) He sought "reasonable accommodations based on my documented disabilities (dyslexia and dysthymia) and my physical disability from chronic foot and ankle pains," noting that the pains "have caused me to miss time from work resulting in disciplinary action which has, in turn, initiated a cycle of anxiety attacks and depression." (Dkt. No. 47-10 at 2.) Plaintiff filed a grievance related to the removal and entered into a Last Chance Agreement ("LCA") with USPS that allowed him to return to work on August 12, 2013. (Dkt. No. 48 ¶ 8; Dkt. No. 48-5.) As to his request for reasonable accommodations, Plaintiff and his father later met with his supervisor Ms. Lozano, his

union representative Dean DeLuna, and other USPS representatives. (Dkt. No. 47-1 at 89:9–90:14, 91:12–93:14.)

In July 2014, Plaintiff received a second Notice of Removal for "Violation of Terms and Conditions of Settlement Agreement – Continued Failure to Be Regular in Attendance and to Report for Duty as Scheduled and Required – Failure to Follow Instructions." (Dkt. No. 48 ¶ 12; Dkt. No. 48-6.) One of the bases for removal was more than 30 unscheduled absences between October 2013 and June 2014. (Dkt. No. 48-6 at 6–7.) He was removed as of August 11, 2014. (*Id.* at 2.) Plaintiff again filed a grievance and entered into a second LCA that allowed him to return to work on January 7, 2015. (Dkt. No. 48 ¶ 13; Dkt. No. 48-7.)

Around 2016, Paul Lew became Plaintiff's supervisor. (Dkt. No. 55-2 at 50:14-17.) On March 9, 2016, Plaintiff injured his back at work. (*Id.* at 81–83.) In a note describing what happened after his injury, Plaintiff wrote: "This is another situation where, due to his disability, [Plaintiff] relied on others to address processes relative to his injury." (*Id.* at 83.)

In October 2016, Plaintiff received a third Notice of Removal for "Violation of Terms and Conditions of Settlement Agreement – Continued Failure to Be Regular in Attendance and to Report for Duty as Scheduled and Required." (Dkt. No. 48 ¶ 14; Dkt. No. 48-8.) Between January 7, 2015, when Plaintiff returned on the second LCA, and November 23, 2016, when the third Notice of Removal took effect, Plaintiff had 222 unscheduled absences. (Dkt. No. 48 ¶ 17; Dkt. No. 48-11.) Plaintiff again filed a grievance. As part of the grievance process, in January 2017 Plaintiff proposed a return-to-work plan "intended to allow communication between the USPS and [Plaintiff's] Therapist, Deborah Abraham, who will help him avoid pit falls and address any issues so that he may avoid violating his terms of employment." (Dkt. No. 55-2 at 87.) In April 2017, Plaintiff submitted a note from Dr. Abraham explaining the treatment goal of "support[ing] [Plaintiff] in direct communication, anxiety reduction and planning ahead." (*Id.* at 88.) At his deposition, Plaintiff testified:

> Q. [I]s this a correct characterization of what you were proposing in 2016? So say you didn't come to work one day, . . . and you were feeling kind of down or badly for some reason. The idea would be that . . . Dr. Abraham would kind of be on hand to help you through that time and also be sort of a liaison between you and USPS to kind

4

of troubleshoot that incident with you?

A. Exactly.

(*Id.* at 18:12-20.)  The grievance process ended when Plaintiff and USPS entered into a settlement that extended the terms of the second LCA and allowed Plaintiff to return to work in December 2017. (Dkt. No. 48 ¶ 15; Dkt. No. 48-9.)

In November 2017, Plaintiff filed an Equal Employment Opportunity ("EEO") pre-complaint alleging discrimination on the basis of "mental disability." (Dkt. No. 55-2 at 91.)  He alleged that in a just cause interview with Mr. Lew in September 2016,

> I was asked questions regarding my absences from work, my understanding of proper medical documentation and my ability to recognize statements that constitute acceptable evidence of incapacitation.  I did not fully comprehend nor could I respond to these questions due to my disability and limited language ability. . . . I believe that Mr. Lew did not consider my disability . . . in recommending my removal from service as a result of this Just Cause process and this constituted discrimination due to my disability.

(*Id.* at 92.)  Plaintiff then addressed the October 2016 third Notice of Removal:

> During the term of [the second LCA] I . . . experienced repeated incidences of back pains and injuries as a result of my work.  I have attempted to follow the procedures established by the USPS requiring that I obtain medical documentation, called the 800 absence tracking phone number and reported information to my supervisor.  I was not advised until after more than one year and nine months that my handling of injuries and illness would be raised as a cause for removal from service. . . .  Due to my disability, I was unaware that my attempts to justify my absences were not sufficient.  The failure of the USPS management to advise me prior to September 28, 2016 of the intent to take action for removal provided no opportunity for me to address deficiencies.

(*Id.*)

When Plaintiff returned to work in December 2017, his supervisor was Mr. Lew. (*Id.* at 38:23-25.)  On March 7, 2018, Plaintiff wrote a letter to Mr. Lew with assistance from his father. (*Id.* at 114.)

> I am concerned that the underlying conditions that contributed to my inability to acquire required documentation and communicate with USPS management regarding my work still exist.  I am currently working under a [LCA] and I want to avoid the situation that occurred previously where, after a just-cause interview, I was notified of removal from service with no prior notice and no ability [to] explain . . . .

5

> . . .
> It was my hope that the USPS would agree to a plan that was proposed for cooperative efforts between USPS resources and my private therapist to assist me in addressing issues related to my work.
> . . .
> I am formally requesting that the Counseling portions of the attached plan be considered for approval as a reasonable accommodation to support my efforts to avoid a repeat of events that resulted in my removal from service.

(*Id.*) Plaintiff looked for Mr. Lew but could not find him, and left the letter on a shared desk used by Mr. Lew. (*Id.* at 20:10–21:14, 47:9-17.) Mr. Lew attested that he did not receive the letter. (Dkt. No. 47-9 at 7.)

On May 17, 2018, Plaintiff wrote a second letter to Mr. Lew, which reiterated the March request for reasonable accommodation and stated that Plaintiff had received no response from anyone. (Dkt. No. 55-2 at 116.) The letter also said that Plaintiff had been advised that his health insurance was canceled on January 8, 2018, and asked Mr. Lew to "investigate why my coverage has been canceled and advise me as to what action I need to take to correct this situation." (*Id.*) He again left the letter on Mr. Lew's desk. (*Id.* at 20:10–21:14.) Mr. Lew attested that he did not receive the second letter and was not aware of a reasonable accommodation request. (Dkt. No. 47-9 at 8.) On May 29, 2018, Plaintiff initiated a second EEO process seeking, in part, the reasonable accommodation requested in the March and May letters. (Dkt. No. 47-12.)

In June 2018, Mr. Lew held a just cause interview with Plaintiff. (Dkt. No. 55-2 at 62:6-7.) Mr. Lew recommended removal. (Dkt. No. 47-9 at 4–6.) As part of the investigation into Plaintiff's November 2017 EEO complaint, Mr. Lew attested in November 2018 that he was "not aware that [Plaintiff] suffers from any medical conditions or impairments." (*Id.* at 2–3.) At his deposition, however, Mr. Lew testified that he first learned Plaintiff has a disability shortly after the June 2018 just cause interview, from union representative Mr. DeLuna. (Dkt. No. 55-2 at 51:2-8.) Mr. Lew testified that he did not reconsider his request to remove Plaintiff after learning of the disability, because the removal was based on unscheduled absences. (*Id.* at 51:19–52:3.)

In July 2018, Plaintiff received a fourth Notice of Removal for "Violation of Terms and Conditions of Settlement Agreement – Continued Failure to Be Regular in Attendance and to Report for Duty as Scheduled and Required." (Dkt. No. 48 ¶ 16; Dkt. No. 48-10.) In the removal

1  process, Plaintiff was asked to "explain each of your unscheduled absences [between November
2  17, 2017 and June 13, 2018] as listed on your Employee Key Indicator Report?" (Dkt. No. 47-3 at
3  5, 2.) Plaintiff responded, "Other than taking BART to work." (*Id.* at 5.) He later testified that
4  this meant "trying to get to work on BART, public transportation." (Dkt. No. 47-1 at 131:9-10.)
5  Under the fourth Notice of Removal, Plaintiff was removed as of August 7, 2018. (Dkt. No. 48-10
6  at 2.) He did not return to USPS.

After completing an administrative EEO process, Plaintiff filed this lawsuit. His Second Amended Complaint ("SAC") (Dkt. No. 19) brings claims for disability discrimination and failure to accommodate under the Rehabilitation Act and for retaliation under Title VII of the Civil Rights Act of 1964.

**DISCUSSION**

**I.   Evidentiary Issues**

Pursuant to Civil Local Rule 7-3(a), USPS included evidentiary objections in the body of its reply brief. N.D. Cal. Civ. L.R. 7-3(a); (Dkt. No. 56 at 9–11.) USPS's objections to Plaintiff's evidence are DENIED as moot. Plaintiff filed a standalone response to the objections, (Dkt. No. 57), and USPS moves for leave to file a response, (Dkt. No. 58). USPS's administrative motion is DENIED as moot because the Court grants USPS's motion for summary judgment, as explained below.

**II.  Discrimination & Failure to Accommodate**

Plaintiff's first claim for relief alleges "[d]iscrimination based on disability and the failure to accommodate a qualified individual with a disability." (Dkt. No. 19 ¶ 83.) While the two theories of liability share some elements, they are "analytically distinct." *Johnson v. Bd. of Trs. of Boundary Cty. Sch. Dist. No. 101*, 666 F.3d 561, 567 (9th Cir. 2011).[3]

**A.   Discrimination**

"To state a prima facie case under the Rehabilitation Act, a plaintiff must demonstrate that

---

[3] Throughout the opinion the Court uses case law on the Americans with Disabilities Act ("ADA"), which also applies to claims under the Rehabilitation Act. *See Coons v. Sec'y of U.S. Dep't of Treasury*, 383 F.3d 879, 884 (9th Cir. 2004).

7

(1) [he] is a person with a disability, (2) who is otherwise qualified for employment, and (3) suffered discrimination because of [his] disability." *Walton v. U.S. Marshals Serv.*, 492 F.3d 998, 1005 (9th Cir. 2007). USPS moves for summary judgment on the grounds that a reasonable trier of fact could not find that Plaintiff was otherwise "qualified" for employment.

The Rehabilitation Act "place[s] the burden on plaintiffs to prove that they are qualified handicapped individuals," defined as "ones who, with or without reasonable accommodation, can perform the essential functions of their job." *Buckingham v. U.S.*, 998 F.2d 735, 739–40 (9th Cir. 1993). "If accommodation to their handicap is required to enable them to perform essential job functions, then plaintiffs must only provide evidence sufficient to make at least a facial showing that reasonable accommodation is possible." *Id.* at 740 (cleaned up). Upon the plaintiff's prima facie showing,

> [a]n employer, to meet its burden under the Act, may not merely speculate that a suggested accommodation is not feasible. When accommodation is required to enable the employee to perform the essential functions of the job, the employer has a duty to gather sufficient information from the applicant and qualified experts as needed to determine what accommodations are necessary to enable the applicant to perform the job.

*Id.* (cleaned up).

### 1. Attendance as an Essential Job Function

USPS argues that Plaintiff was not "qualified" as a matter of law because of his repeated unscheduled absences. As the Ninth Circuit explained in *Samper v. Providence St. Vincent Medical Center*:

> Although [Plaintiff] retains the burden of proof in making her prima facie case, [the employer] has the burden of production in establishing what job functions are essential as much of the information which determines those essential functions lies uniquely with the employer. To meet its burden of production, [the employer] must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding . . . that compliance with the attendance policy is an essential function of the job.

675 F.3d 1233, 1237 (9th Cir. 2012) (cleaned up).

> [I]n those jobs where performance requires attendance at the job, irregular attendance compromises essential job functions. Attendance may be necessary for a variety of reasons. Sometimes, it

8

> is required simply because the employee must work as part of a team. Other jobs require face-to-face interaction with clients and other employees. Yet other jobs require the employee to work with items and equipment that are on site.

*Id.* (cleaned up).

Here, the record establishes that performance of Plaintiff's job as a MHEO "requires attendance at the job." *Id.* Plaintiff testified that working the day shift required him to clock in at 7:00 a.m. and out at 3:30 p.m., that all of his work took place at the Oakland Processing and Distribution Center, and that he could not work from home. (Dkt. No. 47-1 at 37:22–38:9.) Other evidence shows that a MHEO's unscheduled absence negatively impacted USPS operations. Mr. DeLuna, a MHEO and Plaintiff's union representative, explained:

> Delivery trucks containing mail arrive at the processing plant on a schedule, and the MHEOs dispatch that mail to other areas of the plant for sorting and processing by others, and then back to the appropriate trucks for dispatching to other facilities. . . . If an MHEO does not report to work as scheduled, management must maneuver employees from other operations . . . . This in turn causes staff shortages in other operations, which may result in delays of processing the mail as scheduled, and a failure to meet service obligations. The predictability of an MHEO's schedule, including regular attendance and timely check in and out of shifts, is an important aspect of the overall operation at the facility.

(Dkt. No. 49 ¶ 6.) Renee Chaney, a plant manager for two processing centers (not Plaintiff's), attested:

> The processing plant runs on a very strict schedule. . . . Unscheduled absences cause a domino effect throughout the entire plant. . . . There is a set number of MHEOs scheduled to work to account for the volume of mail that needs to be moved to another operation by a certain time. Some employees working at machines cannot begin their work until the mail is unloaded and brought to their station[,] . . . [which] causes interruptions and delays across the entire processing operation at the plant and then . . . the distribution of mail. Employees failing to report to work as scheduled also causes a need for unnecessary overtime because mail takes longer to process than anticipated by the schedule.

(Dkt. No. 50 ¶ 3.) Thus, the MHEO job required Plaintiff to both "work as part of a team" and "work with items and equipment that are on site." *Samper*, 675 F.3d at 1237; *cf. Law v. U.S. Postal Serv.*, 852 F.2d 1278, 1279–80 (Fed. Cir. 1988) (affirming that "requisite nexus" existed between mail handler's unscheduled absences and efficient operation of USPS).

Moreover, the first, second, and extended second LCAs to which Plaintiff agreed,

1   beginning in August 2013, underscored that attendance was integral to job performance.

> [Plaintiff] will be required to maintain an acceptable level of attendance as required by the provisions of Employee and Labor Relations Manual (ELM) 665.41 . . . . Unscheduled absences are defined . . . as any absence not requested and approved in advance of his scheduled reporting time and includes but is not limited to, tardiness, emergency leave, such as emergency annual leave or sick leave, leave without pay (LWOP) and failure to report as scheduled for overtime or holiday work.

(Dkt. No. 48-5 at 3.)

> [Plaintiff] agrees and understands that he must be regular in attendance. For the purposes of this agreement, "regular attendance" is defined as no more than three (3) unscheduled absences (including tardies) or a total of 24 hours during any rolling six (6) month period . . . . Plaintiff agrees that he is responsible for monitoring his own attendance. . . . [Plaintiff] clearly understands that his failure to be regular in attendance and/or being AWOL is a violation of the above terms and will establish just cause for his immediate removal[.]

(Dkt. No. 48-7 at 3; *see* Dkt. No. 48-9.) Therefore, USPS has met its burden of production to establish that performance of Plaintiff's job requires attendance. *Samper*, 675 F.3d at 1238 (holding that employer met burden of production with "written job description requir[ing] strict adherence to the attendance policy" and supervisor's declaration that unscheduled absences led to understaffing and compromised operations).

At oral argument, Plaintiff argued that most of the unexcused absences were actually late arrivals. USPS has also established, as an undisputed fact, that arriving to work in a timely manner is an essential function of Plaintiff's job. Late arrivals negatively impact plant operations in a similar manner to full absences, (Dkt. No. 49 ¶ 6; Dkt. No. 50 ¶ 3), and Plaintiff's LCAs specified that tardies are considered unscheduled absences, (Dkt. No. 48-5 at 3; Dkt. No. 48-7 at 3). Thus, USPS has met its related burden of production to establish that performance of Plaintiff's job requires timely arrival.

### 2. Availability of a Reasonable Accommodation

Plaintiff argues that summary judgment must be denied because a reasonable trier of fact could find that he could perform the essential functions of the job "with . . . a reasonable accommodation" and is therefore otherwise "qualified." *Buckingham*, 998 F.2d at 740. Plaintiff requested as an accommodation "communication between the USPS and [Dr. Abraham], who will

10

1 help [Plaintiff] avoid pit falls and address any issues so that he may avoid violating his terms of
2 employment." (Dkt. No. 55-2 at 87; *see id.* at 18:12-20.) He later requested "cooperative efforts
3 between USPS . . . and my private therapist to assist me in addressing issues related to my work."
4 (*Id.* at 114.) The SAC characterizes the request as "providing a mechanism for [Plaintiff's]
5 psychotherapist to communicate directly with a Postal Service-designated individual who could
6 discuss any on-the-job occurrences that might affect his performance so he could correct them
7 before disciplinary action was necessary." (Dkt. No. 19 ¶ 45.)

8 The record does not include evidence sufficient to support an inference that having
9 Plaintiff's therapist communicate directly with USPS would improve Plaintiff's attendance
10 enough to make him "otherwise qualified." Plaintiff suggests that Dr. Abraham could help him
11 understand and follow processes to document his absences. This suggestion is insufficient to
12 create a genuine dispute of fact for two reasons. First, Plaintiff had been seeing Dr. Abraham
13 weekly from November 2016 until at least April 2017, and every other week for several years
14 before 2016. (Dkt. No. 55-2 at 88.) Thus, Dr. Abraham was available to help him document his
15 absences without an accommodation from USPS. Plaintiff does not identify any evidence that
16 supports a finding that USPS needed to do something more to enable Dr. Abraham to play this
17 role. At oral argument, Plaintiff referred to a period of time when he did not have health
18 insurance. (*See id.* at 116 (Plaintiff's May 2018 letter to Mr. Lew stating that his health insurance
19 was canceled in January 2018 and asking Mr. Lew to investigate).) But even assuming that
20 Plaintiff's lack of insurance prevented him from receiving treatment from Dr. Abraham after
21 January 2018—an inference not supported by the current record—the record compels a finding
22 that Plaintiff had frequent absences throughout the period when he received treatment.

23 Second, the record does not support an inference that documentation was the issue. The
24 record evidence does not support a finding that all or most of Plaintiff's more than 500
25 unscheduled absences would have been approved if he had scheduled them in advance or
26 documented them afterwards. Plaintiff also suggests that Dr. Abraham could help him plan ahead,
27 possibly reducing absences, but, again, the record does not support a finding that her
28 communicating with USPS—the proposed accommodation—would facilitate that planning.

11

Plaintiff had already been seeing Dr. Abraham and did not need an accommodation from USPS to receive that treatment.

### 3. Interactive Process

In his summary judgment briefing, Plaintiff does not propose a specific accommodation; instead, he argues that USPS failed to engage in an interactive process to identify a reasonable accommodation after Plaintiff requested one. He contends that this fact alone defeats summary judgment. (Dkt. No. 55 at 11.) Plaintiff is only half right.

"It is the employer's responsibility, through participation in the interactive process, to assist in identifying possible accommodations." *Morton v. United Parcel Serv., Inc.*, 272 F.3d 1249, 1256 (9th Cir. 2001), *overruled on other grounds by Bates v. United Parcel Serv., Inc.*, 511 F.3d 974 (9th Cir. 2007). "This interactive process is triggered upon notification of the disability and the desire for accommodation. An employer who fails to engage in such an interactive process in good faith may incur liability if a reasonable accommodation would have been possible." *Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002) (cleaned up). "[T]here exists no stand-alone claim for failing to engage in the interactive process. Rather, discrimination results from denying an available and reasonable accommodation." *Snapp v. United Transp. Union*, 889 F.3d 1088, 1095 (9th Cir. 2018).

The plaintiff need not prove he proposed a reasonable accommodation to succeed on a failure to engage in the interactive process theory. As the Ninth Circuit has explained:

> The range of possible reasonable accommodations, for purposes of establishing liability for failure to accommodate, can extend beyond those proposed: an employer who acts in bad faith in the interactive process will be liable if the jury can reasonably conclude that the employee would have been able to perform the job with accommodations. In making that determination, the jury is entitled to bear in mind that had the employer participated in good faith, there may have been other, unmentioned possible accommodations.

*Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1115–16 (9th Cir. 2000) (cleaned up), *vacated on other grounds sub nom. US Airways, Inc. v. Barnett*, 535 U.S. 391 (2002). If an employer fails to engage in a good faith interactive process that might have yielded a reasonable accommodation, what matters is not whether the plaintiff proposed a reasonable accommodation, but whether one

12

1   was available. *See id*. at 1116 ("[E]mployers[] who fail to engage in the interactive process in

2   good faith[] face liability for the remedies imposed by the statute if a reasonable accommodation

3   would have been possible."). Thus, the plaintiff opposing summary judgment must offer enough

4   evidence to create a genuine dispute as to whether the employer engaged in good faith in the

5   interactive process. In turn, the employer seeking summary judgment must *establish* that no

6   reasonable accommodation was possible. *See id.* at 1116–17; *Morton*, 272 F.3d at 1256 & n.7

7   ("*Barnett* [held] that the task of proving the negative—that no reasonable accommodation was

8   available—rests with an offending employer throughout the litigation, and that, given the

9   difficulty of proving such a negative, it is not likely that an employer will be able to establish on

10  summary judgment the absence of a disputed fact as to this question.").

### a. Failure to engage in interactive process

12  As to Plaintiff's burden, the record reflects a genuine dispute as to whether USPS engaged

13  in a good faith interactive process with Plaintiff. Plaintiff first requested a reasonable

14  accommodation as early as April 2013. (Dkt. No. 55-2 at 13:1-2, 16:9-16; Dkt. No. 47-10.) He

15  then attempted to request a reasonable accommodation specifically from Mr. Lew in March and

16  May 2018. (Dkt. No. 55-2 at 114, 116.) While Mr. Lew testified that he did not receive Plaintiff's

17  requests, (Dkt. No. 47-9 at 7–8), a reasonable trier of fact could find that he did. Further, at the

18  end of May 2018, Plaintiff initiated an EEO process that included a request for reasonable

19  accommodation. (Dkt. No. 47-12.) On the whole, there is conflicting evidence in the record as to

20  whether the interactive process requirement was "triggered upon notification of the disability and

21  the desire for accommodation," such that a reasonable jury could conclude that USPS was

22  required to engage in a good faith interactive process. *Vinson*, 288 F.3d at 1154. In addition,

23  because Mr. Lew did not reconsider the pending request to remove Plaintiff after he learned of

24  Plaintiff's disability, a reasonable jury could conclude that USPS failed to engage in a good faith

25  interactive process.

### b. Whether a reasonable accommodation was possible

27  As to USPS's burden, based on the summary judgment record, every reasonable

28  trier of fact would have to find that no reasonable accommodation was available to enable Plaintiff

to perform the essential function of attendance. It is undisputed that Plaintiff had more than 500 unscheduled absences between 2012 and 2018. (Dkt. No. 48 ¶ 17; Dkt. No. 48-11.) Between January 2015 and November 2016, he had 222 unscheduled absences. (Dkt. No. 48 ¶ 17; Dkt. No. 48-11.) No reasonable jury could determine that attendance problems of this magnitude and duration could be remedied by a reasonable accommodation. *See Demorest v. Napolitano*, No. 09–1310RAJ, 2010 WL 3211947 (W.D. Wash. Aug. 11, 2010) (concluding that employee who missed 49% of work hours in one year, due to both unapproved absences without leave and approved leave without pay, could not perform essential function of attendance), *aff'd*, 443 F. App'x 287, 288 (9th Cir. 2011) ("Because no reasonable accommodation was possible, summary judgment was also appropriate as to the interactive process claim."). The record does not support an inference that a leave of absence, albeit never requested by Plaintiff or Dr. Abraham, could have enabled Plaintiff to perform the essential job function of attendance. *Contra Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1131, 1135–36 (9th Cir. 2001) (finding leave of absence a reasonable accommodation because it would allow employee to receive treatment and potentially, upon return, to perform essential functions); *Kimbro v. Atl. Richfield Co.*, 889 F.2d 869, 877–79 (9th Cir. 1989) (finding leave of absence a reasonable accommodation because it might allow employee to endure "acute episode" and "then return to work unimpaired," or because it might allow employee's doctors "an opportunity to design an effective treatment program").

Indeed, the record compels the finding that the only accommodation that could have made a meaningful difference here would effectively be an exemption from the attendance policy. The Ninth Circuit held in *Samper* that such an exemption is not a reasonable accommodation:

> An accommodation that would allow [Plaintiff] to simply miss work whenever she felt she needed to and apparently for so long as she felt she needed to as a matter of law is not reasonable on its face. . . . [Plaintiff's] approach would eviscerate any attendance policy, leaving the hospital with the potential for unlimited absences.

675 F.3d at 1240 (cleaned up). While the stakes of attendance in Plaintiff's workplace are not as high as in the *Samper* hospital neo-natal intensive care unit, there is no genuine dispute that attendance is an essential function of Plaintiff's job, as explained above. Thus, notwithstanding the genuine dispute as to whether USPS engaged in a good faith interactive process, "a reasonable

14

1 finder of fact *must* conclude that there would in any event have been no reasonable
2 accommodation available." *Dark v. Curry County*, 451 F.3d 1078, 1088 (9th Cir. 2006) (cleaned
3 up); *cf. Barnett*, 228 F.3d at 1117 ("There remains conflicting evidence in the record as to whether
4 a reasonable accommodation . . . was possible," because "[t]his is not a case where it is obvious
5 that no modification could enable the employee to perform the essential functions.").

* * *

Because every reasonable trier of fact would have to find that no reasonable accommodation could have enabled Plaintiff to perform the essential job function of attendance, there is no genuine dispute of fact as to whether he "could perform the essential functions" "with or without reasonable accommodation." *Buckingham*, 998 F.2d at 940. As such, Plaintiff has not offered enough evidence to create a genuine dispute of fact as to the second element of a prima facie case of disability discrimination, whether he was "otherwise qualified for employment." *Walton*, 492 F.3d at 1005. Accordingly, USPS is entitled to judgment as a matter of law on Plaintiff's discrimination claim.

### B. Failure to Accommodate

"[T]he failure to provide a reasonable accommodation [is] an act of discrimination if the employee is a 'qualified individual,' the employer receives adequate notice, and a reasonable accommodation is available that would not place an undue hardship on the operation of the employer's business." *Snapp*, 889 F.3d at 1095. "[T]here exists no stand-alone claim for failing to engage in the interactive process. Rather, discrimination results from denying an available and reasonable accommodation." *Id.*

For the reasons explained above, there was no "available and reasonable accommodation" that could have enabled Plaintiff to perform the essential job function of attendance. *Id.* Thus, there is no triable issue as to that element of his failure to accommodate claim. *See Samper*, 675 F.3d at 1240 (explaining that requesting an "accommodation that exempts [a plaintiff] from an essential function" "caus[es] the essential functions and reasonable accommodation analyses to run together"). Accordingly, USPS is entitled to judgment as a matter of law on Plaintiff's failure to accommodate claim.

15

### III.    Retaliation

To establish a prima facie case of retaliation under Title VII, a plaintiff must show (1) he engaged in a protected activity; (2) he suffered an adverse employment action; and (3) a causal link exists between the two. *Manatt v. Bank of Am.*, 339 F.3d 792, 800 (9th Cir. 2003). If the plaintiff establishes a prima facie case, the burden shifts to the defendant to "present legitimate reasons for the adverse employment action." *Coons v. Sec'y of U.S. Dep't of Treasury*, 383 F.3d 879, 887 (9th Cir. 2004) (citation omitted). The plaintiff then has the opportunity to demonstrate a genuine issue of material fact as to whether the employer's proffered reason is pretext, so as to withstand the defendant's motion for summary judgment. *Id.* USPS argues that Plaintiff fails to establish the third element of a prima facie case or that USPS's legitimate, non-discriminatory reason is pretext.

#### A.    Prima Facie Case

As to the first and second elements of a prima facie case, Plaintiff alleges that he "engaged in numerous protected activities by contacting the Agency EEO Liaison[] and making complaints of disparate treatment and failure to accommodate," and suffered adverse actions in the form of "failure to accommodate his disability[] and ultimately the termination of his employment." (Dkt. No. 19 ¶¶ 95–96.) The record supports a finding of the following complaints:

- Plaintiff's November 2017 EEO pre-complaint regarding his September 2016 just cause interview with Mr. Lew and his October 2016 notice of removal, (Dkt. No. 55-2 at 91–92); and

- Plaintiff's May 2018 EEO pre-complaint seeking a reasonable accommodation, (Dkt. No. 47-12).

*See Ray v. Henderson*, 217 F.3d 1234, 1240 & n.3 (9th Cir. 2000) (describing protected activity). The record also supports a finding of the following requests for reasonable accommodation:

- Plaintiff's April 2018 request in writing to Ms. Lozano, which led to discussions with her and other USPS representatives, (Dkt. No. 47-10; Dkt. No. 47-1 at 89:9–90:14, 91:12–93:14);

- Plaintiff's January and April 2017 written proposals for communication between USPS and Dr. Abraham, (Dkt. No. 55-2 at 87–88); and

- Plaintiff's March and May 2018 requests in writing to Mr. Lew,

(*id.* at 114, 116).

*See Pardi v. Kaiser Found. Hosps.*, 389 F.3d 840, 850 (9th Cir. 2004) ("[p]ursuing one's rights under the ADA constitutes a protected activity"). There is also evidence in the record about the following putative adverse actions, *see Ray*, 217 F.3d at 1240–43: Plaintiff's July 2010 suspension; his March 2012 letter of warning; his January 2013 suspension; his March 2013 notice of removal as of April 2013; his July 2014 notice of removal as of August 2014; his October 2016 notice of removal as of November 2016; and, finally, his July 2018 notice of removal that led to his termination in August 2018. (Dkt. Nos. 48-1, 48-2, 48-3, 48-4, 48-6, 48-8, 48-10.)

As to the third element of a prima facie case, Plaintiff does not identify evidence as to the decisionmakers behind the adverse actions other than the 2018 removal. As to the 2018 removal, a trier of fact could find that Mr. Lew was the decisionmaker; he conducted the just cause interview in June 2018 and issued the notice of removal in July 2018. (Dkt. No. 47-9 at 5–6.)

USPS offers conflicting evidence as to when Mr. Lew knew of Plaintiff's disability: that he learned shortly after the June 2018 just cause interview, from Mr. DeLuna, (Dkt. No. 55-2 at 51:2-8), or that he did not know even as of November 2018, (Dkt. No. 47-9 at 2–3). Mr. Lew testified that he did not receive the disability accommodation requests Plaintiff left on a shared desk in March and May 2018. (*Id.* at 7–8.) Based on the conflicting evidence in the record and the evidence that each of Plaintiff's letters requesting accommodation was left on Mr. Lew's shared desk and specifically addressed to Mr. Lew, and drawing all reasonable inferences in Plaintiff's favor, there is a genuine dispute of fact as to whether Mr. Lew knew of Plaintiff's disability when he recommended removal. *See Thomas v. City of Beaverton*, 379 F.3d 802, 812 n.4 (9th Cir. 2004) ("The employer's awareness of the protected activity is [] important in establishing a causal link."). If Mr. Lew was aware of Plaintiff's disability before recommending removal in or around June 2018, then the temporal proximity between Plaintiff's March and May 2018 protected activity and Mr. Lew's adverse employment action is sufficient evidence to support an inference of causation. *See id.* at 812; *Yartzoff v. Thomas*, 809 F.2d 1371, 1375–76 (9th Cir. 1987) (holding that plaintiff established prima facie case of retaliation, based on "employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and

the allegedly retaliatory employment decision"); *Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 731–32 (9th Cir. 1986).

Accordingly, there is sufficient evidence in the record to support an inference in Plaintiff's favor on the three elements of a prima facie case for retaliation.

### B.     Pretext

Upon the plaintiff's prima facie showing, the burden shifts to the defendant to "present legitimate reasons for the adverse employment action." *Coons*, 383 F.3d at 887 (citation omitted). USPS asserts a legitimate, non-discriminatory interest "in removing Plaintiff in light of his repeated attendance problems and violations of multiple 'last chance' opportunities to correct this conduct that was otherwise an undue burden on the predictable and reliable operation of mail handling services." (Dkt. No. 46 at 32.)  As discussed above, there is ample evidence in the record to support an inference that USPS's reason for removing Plaintiff was legitimate.  Attendance was an essential function of Plaintiff's job and he had more than 500 unscheduled absences over several years, with no indication that the absences would taper off.

Upon presentation of that legitimate reason, the burden shifts back to Plaintiff to demonstrate a genuine dispute of fact as to whether the employer's proffered reason is pretext. *Coons*, 383 F.3d at 887.  Plaintiff's opposition does not address pretext.  Nevertheless, at oral argument Plaintiff argued that the contradictory evidence as to when Mr. Lew knew of Plaintiff's disability creates a genuine dispute of fact as to pretext.  The Court agrees, as discussed above, that the contradictory evidence of Mr. Lew's knowledge creates a genuine dispute as to the causal link required for a prima facie case of retaliation.  However, even if the evidence supports an inference of dissembling on knowledge, it does not support an inference that attendance was an illegitimate or pretextual reason to remove Plaintiff.  The record compels a finding that Plaintiff's attendance issues long predated the 2018 removal process and that USPS took action on Plaintiff's unscheduled absences as early as 2010.  *See Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 797 (9th Cir. 1982) ("An employer who has decided upon a [course of action] is not guilty of unlawful retaliation simply because it proceeds . . . after learning that one of the employees . . . has recently engaged in a protected activity.").  Further, the Court's own review of the record does not identify

18

any evidence that would permit a reasonable trier of fact to find pretext on any other basis. Thus, Plaintiff has not met his burden to demonstrate a genuine dispute as to pretext. *See Coons*, 383 F.3d at 887–88.

Accordingly, USPS is entitled to judgment as a matter of law on Plaintiff's retaliation claim.

## CONCLUSION

For the reasons explained above, Defendants are entitled to summary judgment on Plaintiff's claims for disability discrimination and failure to accommodate under the Rehabilitation Act and for retaliation under Title VII. Defendants' motion for summary judgment, (Dkt. No. 46), is GRANTED and their administrative motion, (Dkt. No. 58), is DENIED as moot. Defendants' objections to Plaintiff's evidence are also DENIED as moot.

This Order disposes of Docket Nos. 46, 58.

**IT IS SO ORDERED.**

Dated: December 17, 2021

JACQUELINE SCOTT CORLEY
United States Magistrate Judge

19